UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


ANITRA L. COOMER,

                  Petitioner,

v.                                        CASE NO. 04-CV-72217-DT
                                        HONORABLE NANCY G. EDMUNDS

JOAN YUKINS,

                  Respondent.

_____/

## **OPINION AND ORDER DENYING HABEAS CORPUS PETITION**

Petitioner Anitra L. Coomer has applied for the writ of habeas corpus pursuant to 28 U.S.C. § 2254. The Court has concluded for reasons given below that Petitioner is not entitled to habeas relief. Accordingly, the habeas petition will be denied.

### I. Background

Petitioner was tried jointly, but before separate juries, with co-defendant, McConnell Adams. On October 27, 1997, the jury found Petitioner guilty of two counts of first-degree murder, MICH. COMP. LAWS § 750.316,[1] and one count of kidnapping, MICH. COMP. LAWS § 750.349. The convictions arose from the abduction and murder of Dr. Deborah Iverson on May 16, 1996.[2] The prosecutor's theory was that Petitioner aided and abetted McConnell Adams, who strangled Dr. Iverson. Petitioner admitted being involved in the crimes, but she claimed

---

[1] Although there was one victim, Petitioner was charged with two counts of first-degree murder because the prosecutor proceeded on two different theories: premeditated murder and felony murder.

[2] *See* Appendix for a complete summary of the facts leading to Petitioner's convictions.

that she was guilty of being a mere accessory after the fact.  The jury was unpersuaded by

Petitioner's defense and convicted her as charged.  The trial court sentenced Petitioner to life

imprisonment for the murder and to a term of fifteen to sixty years in prison for the kidnapping.

Petitioner made the following arguments through counsel in an appeal of right:

I.    The police interrogated Anitra Coomer before she made any
      statement.

II.   When the interrogation began a reasonable person would not have
      felt at liberty to terminate it.

III.  After verbally confessing to involvement in a homicide, a
      reasonable person would not have felt at liberty to terminate the
      remainder of the interrogation.

IV.   The written statement Anitra Coomer made at the sheriff's
      department was the fruit of the earlier verbal and written
      statements.

V.    The trial court *sua sponte* and incorrectly gave the jury the option
      on the verdict form of finding Anitra Coomer guilty of either the
      substantive offenses or aiding and abetting same.

VI.   Convictions for first-degree premeditated murder, first degree
      felony murder, and kidnapping violate double jeopardy.

In a *pro se* supplemental brief, Petitioner argued:

Defendant was denied her Fourth, Sixth, and Fourteenth Amendment rights to be
free of unreasonable searches and seizures, the effective assistance of defense
counsel, and due process of law when a multi-jurisdictional police entourage
colluded to seize and search Defendant in her apartment without probable cause,
warrant, or exigent circumstances, and defense counsel failed to challenge the
illegally obtained evidence procured from the violation of Defendant's Fourth
Amendment rights.

The Michigan Court of Appeals denied leave to file the *pro se* supplemental brief,

vacated Petitioner's kidnapping conviction on double jeopardy grounds, and affirmed

Petitioner's murder conviction.  The court of appeals also modified the judgment of sentence to

2

show that Petitioner had been convicted of one count of first-degree murder supported by two

theories. *See People v. Coomer*, 245 Mich. App. 206; 627 N.W.2d 612 (2001).

     Petitioner raised only one argument in the Michigan Supreme Court:

> Miranda warnings are required if a suspect is in custody during a police
> interrogation. From the moment the police arrived at Ms. Coomer's apartment to
> question her she was in custody. However, the lower courts failed to find a
> custodial setting during the first part of the police interrogation. The resulting
> confession should necessarily be suppressed as a result of the absence of *Miranda*
> warnings in this case.

On October 29, 2001, the Michigan Supreme Court denied leave to appeal because it was not

persuaded that the question presented should be reviewed. *See People v. Coomer*, 465 Mich.

894; 635 N.W.2d 318 (2001) (table).

     On September 9, 2002, Petitioner filed a motion for relief from judgment in the trial

court. She alleged that (1) the jury verdict form was erroneous, (2) the trial court refused to

respond to one of the deliberating jury's questions, (3) the prosecutor improperly cross-examined

her about the testimony of other witnesses, and (4) the combined effect of the errors required

reversal. The trial court denied Petitioner's motion on the ground that she had failed to meet her

burden of establishing entitlement to relief from judgment under Michigan Court Rule 6.508(D).

     In application for leave to appeal the trial court's decision, Petitioner argued:

> The trial court clearly erred in finding that the defendant was not entitled to relief
> from judgment where the questions of error raised are of constitutional magnitude
> and by law require reversal, are manifestly unjust, were preserved by objection,
> and cannot be deemed . . . strategic[. T]hus, failure to previously raise or fully
> ventilate (sic) can only be attributed prima-facie to ineffective assistance of
> appellate counsel which equates the establishment of "cause and actual prejudice"
> entitling relief from judgment.

The Michigan Court of Appeals denied leave to appeal "for failure to meet the burden of

establishing entitlement to relief under [Michigan Court Rule] 6.508(D)." *People v. Coomer*,

No. 246184 (Mich. Ct. App. July 10, 2003).

Petitioner raised the same argument in the Michigan Supreme Court, along with the

following new issues:

> II.   Whether the jury instructions were flawed where the trial judge sua
> sponte injected an erroneous larceny instruction which
> contradicted the intent element prima facie in support of the felony
> murder count when the underlying felony charge was kidnapping
> and the contradicting intent element relieved the state of the
> burden of proof beyond a reasonable doubt and had a substantial
> and injurious effect or influence in determining the jury verdict in
> violation of due process under the U.S. Constitution, 5th and 6th
> Amendment?

> III.  Defendant was denied her Fourth, Sixth, and Fourteenth
> Amendment rights to be free of unreasonable searches and
> seizures, the effective assistance of defense counsel, and due
> process of law when a multi-jurisdictional police entourage
> colluded to seize and search defendant in her apartment without
> probable cause, warrant, or exigent circumstances, and defense
> counsel failed to challenge the illegally obtained evidence
> procured from the violation of Defendant's Fourth Amendment
> rights.

On January 27, 2004, the Michigan Supreme Court, like the Michigan Court of Appeals, denied

leave to appeal because Petitioner had failed to show entitlement to relief under Michigan Court

Rule 6.508(D).  *See People v. Coomer*, 469 Mich. 998; 675 N.W.2d 591 (2004) (table).

Petitioner filed her habeas corpus petition through counsel on June 15, 2004.  Her

grounds for relief read:

> I.   Petitioner's habeas corpus claims are properly before this Court for
> review.

> II.  The first half of Ms. Coomer's initial confession was taken in
> violation of *Miranda* where multiple police officers showed up at
> the petitioner's home in the middle of the night and questioned her
> about the murder.  A reasonable person would not feel free to leave
> under these circumstances.  The state court's ruling to the contrary

4

is objectively unreasonable.

III.   The  state court's ruling that Ms. Coomer's post Miranda
       statements were dissipated from the taint of the Miranda violation
       which took place during the second half of Ms. Coomer's initial
       confession. (sic)

IV.    The jury instructions in this case were hopelessly confused and
       deprived Ms. Coomer of due process of law.

V.     Ms. Coomer was denied her right to effective assistance of trial
       and appellate counsel where counsel failed to challenge the jury
       instructions in this matter and/or the unlawful entry into the
       common area of Ms. Coomer's apartment.

VI.    The cumulative effect of these errors denied Ms. Coomer a fair
       trial.

Respondent argues that Petitioner's claims are barred by the statute of limitations, that the state

court's conclusion on the issue of custody was not an unreasonable application of Supreme Court

law, and that Petitioner's remaining claims are procedurally defaulted.

## II.  Respondent's Statute-of-Limitations and Procedural Default Defenses

Respondent contends that Petitioner's habeas petition is barred from review by the one-

year statute of limitations for habeas petitions brought by state prisoners.  Although habeas

petitioners usually must file their petitions within one year of the date that their convictions

became final, 28 U.S.C. § 2244(d)(1)(A), the limitations period is tolled while a properly filed

post-conviction motion is pending in state court.  28 U.S.C. § 2244(d)(2).  In *Abela v. Martin*,

348 F.3d 164 (6th Cir. 2003), *cert. denied*, 541 U.S. 1070 (2004), the Sixth Circuit stated that

"the statute of limitations is tolled from the filing of an application for state post-conviction or

other collateral relief until the conclusion of the time for seeking Supreme Court review of the

state's final judgment on that application independent of whether the petitioner actually petitions

5

the Supreme Court to review the case." *Id*. at 172-73.

Respondent's calculation of the limitations period is contrary to *Abela* because it does not take into account the ninety days during which Petitioner could have sought a writ of certiorari following her state collateral appeal. Respondent asserts that the quoted language from *Abela* is mere dicta, not a holding. However, the Sixth Circuit prefaced the statement by saying, "we hold that . . . ." Respondent's argument, therefore, fails. Petitioner's case is not barred from review by the statute of limitations.

Respondent also contends that habeas claims III through V are procedurally defaulted. While this may be true, "[p]rocedural default is not a jurisdictional bar to review on the merits." *Howard v. Bouchard*, 405 F.3d 459, 476 (6th Cir. 2005), *petition for cert. filed*, (U.S. Oct. 4, 2005) (No. 05-7004). The failure to exhaust state remedies also is not a bar to review on the merits. *See* 28 U.S.C. § 2254(b)(2) (stating that "[a]n application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State"). Because the Court finds it easier to address the merits of Petitioner's claims, as opposed to applying the doctrines of exhaustion and procedural default, the Court will excuse the alleged procedural default and any failure to exhaust state remedies. The Court will proceed to address the substantive merits of Petitioner's claims under the following standard of review.

## III.  Standard of Review

Petitioner is entitled to the writ of habeas corpus only if she can show that the state

court's adjudication of her claims on the merits–

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state court's decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). A state court's decision is an "unreasonable application of" clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id*. at 413. "Avoiding these pitfalls does not require citation of [Supreme Court] cases – indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8 (2002) (*per curiam* opinion) (emphasis in original). "Furthermore, state findings of fact are presumed to be correct unless the defendant can rebut the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1)." *Baze v. Parker*, 371 F.3d 310, 318 (6th Cir. 2004), *cert. denied*, __ U.S. __, 125 S. Ct. 1670 (2005).

## IV. Discussion of Claims

## A.  The Oral Confession at Petitioner's apartment[3]

Petitioner made three statements to Detectives William Kucyk and Mark Sanborn:  an oral statement at her apartment; a written statement at her apartment; and a subsequent oral statement at the Oakland County Sheriff's Department.  After a two-day evidentiary hearing on the voluntariness of those statements, the trial court ruled that Petitioner's oral statement at her apartment and her oral statement at the Sheriff's Department were admissible, but her written statement was inadmissible.

Petitioner's second habeas claim attacks the trial court's decision to admit in evidence the oral statement at her apartment.  She alleges that the statement was inadmissible at trial because she was not advised of her constitutional rights before she made the statement.  The two detectives who questioned Petitioner at her apartment (Lieutenant William Kucyk and Sergeant Mark Sanborn) admitted during a pretrial evidentiary hearing and at trial that they did not read Petitioner's constitutional rights to her in her apartment.  The only issue in dispute is whether Petitioner was in custody at the time.

### 1.  The State Court Decisions

The trial court determined from the totality of the circumstances that a reasonable person would not have felt deprived of her freedom or that she was in custody.  The trial court concluded that Petitioner was not in custody when she made her first statement to Detectives Kucyk and Sanborn and, therefore, *Miranda* warnings were unnecessary.

---

[3]  The Court begins its discussion with Petitioner's second claim because the first "claim" is a series of arguments asserting that Petitioner (1) has satisfied the "in custody" requirement of 28 U.S.C. § 2254, (2) has exhausted state remedies for her claims, (3) is not filing a second or successive petition, (4) has filed a timely habeas petition, and (5) is not asserting a Fourth Amendment claim.  These arguments are not substantive claims.

The Michigan Court of Appeals reached the same conclusion. The court of appeals noted that Petitioner permitted the police officers to enter her apartment and the officers did not display weapons. The court of appeals also relied on Lieutenant Kucyk's testimony that Petitioner was not under arrest and that the officers would have left if Petitioner had wanted them to leave. The appellate court noted that Petitioner gave a narrative statement with little police questioning and that she acknowledged not being compelled or coerced to give a statement.

### 2. Supreme Court Precedent

The Fifth Amendment provides that "[n]o person shall be . . . compelled in any criminal case to be a witness against himself. . . ." U. S. CONST. amend. V. To protect a suspect's Fifth Amendment right to remain silent, an individual who

> is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning . . . must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

*Miranda v. Arizona*, 384 U.S. 436, 478-79 (1966). "Statements elicited in noncompliance with this rule may not be admitted for certain purposes in a criminal trial." *Stansbury v. California*, 511 U.S. 318, 322 (1994).

The issue here is whether Petitioner was in custody or otherwise deprived of her freedom by the authorities in any significant way, such that *Miranda* warnings were required before the detectives questioned her. If she was "in custody," her oral confession in her apartment home was inadmissible at trial because she was not first advised of her constitutional rights.

"[A] suspect is in custody when . . . there has been a formal arrest or restraint on freedom of movement." *Biros v. Bagley*, 422 F.3d 379, 389 (6th Cir. 2005) (quoting *Mason v. Mitchell*,

9

320 F.3d 604, 631 (6th Cir. 2003) (quoting *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977))

(quotation marks omitted).   A reviewing court must consider

> "the objective circumstances of the interrogation," rather than "the subjective
> views harbored by either the interrogating officers or the person being
> questioned."  [*Mason*, 320 F.3d at 631] (quoting *Stansbury v. California*, 511 U.S.
> 318, 323 (1994)).  Instead of focusing upon where the questioning occurred or if
> the individual is a suspect, the determination must be concerned with "how a
> reasonable man in the suspect's position would have understood his situation."
> *Id.* (quoting *Berkemer v. McCarty*, 468 U.S. 420, 442 (1984)).

*Id.*  In other words, "[c]ourts must examine 'all of the circumstances surrounding the

interrogation' and determine 'how a reasonable person in the position of the individual being

questioned would gauge the breadth of his or her freedom of action.'"  *Yarborough v. Alvarado*,

541 U.S. 652, 663 (2004) (quoting *Stansbury*, 511 U.S. at 322, 325).  "Two discrete inquiries are

essential to the determination [of custody]:  first, what were the circumstances surrounding the

interrogation; and second, given those circumstances, would a reasonable person have felt he or

she was not at liberty to terminate the interrogation and leave."  *Thompson v. Keohane,* 516 U.S.

99, 112 (1995).

A person can be "in custody" even when the suspect is questioned in his or her home.

*See Orozco v. Texas*, 394 U.S. 324 (1969); *cf. Beckwith v. United States*, 425 U.S. 341 (1976).

When police officers question a suspect in a residence, courts have considered the following

factors:

> (1) the purpose of the questioning; (2) whether the place of the questioning was
> hostile or coercive; (3) the length of the questioning; and (4) other indicia of
> custody such as whether the suspect was informed at the time that the questioning
> was voluntary or that the suspect was free to leave or to request the officers to do
> so; whether the suspect possessed unrestrained freedom of movement during
> questioning; and whether the suspect initiated contact with the police or
> voluntarily admitted the officers to the residence and acquiesced to their requests
> to answer some questions.

10

*United States v. Salvo,* 133 F.3d 943, 950 (6th Cir. 1998).

### 3. The Facts

Petitioner claims that she was in custody because a reasonable person would not have felt free to leave under the circumstances. In support of this claim, Petitioner alleges that the police appeared unannounced at her home in the middle of the night, blocked her car with marked police cars, appeared at her door with at least five police officers, and used a pretext to gain entry to her apartment. Petitioner also alleges that the officers said she was a suspect in a murder case and then questioned her about her involvement in the murder while uniformed police officers stood guard outside her apartment door.

The issue of custody was explored at considerable length during the evidentiary hearing. The trial court summarized the testimony offered at the pretrial evidentiary hearing as follows:

> The evidence here showed that approximately nine to eleven officers were at the scene of Defendant Coomer's apartment on December 30, 1996 at about 11:45 p.m. Defendant Coomer testified that two marked cars were parked in a manner that she could observe them blocking her vehicle while all other witnesses testified that no police vehicles were parked in a manner that Defendant Coomer could observe them . . . out any of her apartment windows.

> Defendant Coomer had never had any prior experience with police officers and had had a friend over one to one and a half hours earlier in the evening with whom she used alcohol and marijuana. The evidence is not clear as to w[h]ether she was told that she was under arrest. Sergeant Kucyk indicated that she had been told that she was not. Defendant indicated that no one told her whether she was or not. Defendant Coomer was 20 years of age, had graduated from high school and had a 4.0 grade point average.

> There was extensive testimony offered by the People to establish where each officer stood, what role each officer played and where each officer parked. The testimony given by numerous officers . . . was consistent as to overall locations and roles with minor variations as to the exact location of a fellow officer's vehicle or position.

> Defendant testified when she opened the door she saw at least three

uniformed officers at her door while two plain clothes officers stepped from behind a wall.  Defendant further testified that three officers entered her apartment while two remained outside her door on Detective Kucyk's instruction. The People elicited consistent testimony from the officers that placed only three officers at her door with only two plain officers -- two plain clothes officers entering the apartment.  Coomer testified one police officer came inside only momentarily and left within minutes; thereafter leaving only Kucyk and Sanborn inside the apartment when statement one was made.

Defendant testified that an officer accompanied her through the apartment while she searched for cigarettes during her confession.  The officers testified this did not occur and Defendant had had the opportunity to walk . . . throughout her apartment freely at all times.  Finally, Defendant testified that she felt that she was in custody the moment she saw Sergeant Kucyk at her door because she . . . had seen him on the news and knew him to be the lead detective in the Iverson homicide investigation.

The evidence further showed that Defendant Coomer invited the officers in to her apartment upon their request and shortly commenced telling them her version of what had occurred after having been asked by Sergeant Kucyk to tell him what she knew about Deborah Iverson.  While she had no prior contacts with the police and was not advised of her rights until about four hours later,  the testimony indicated she had a higher than average grade point average, that there was -- and that there was no physical or mental abuse of any nature exercised by police.  While Defendant testified she had used alcohol and marijuana earlier, at least one and one-half [hours] had passed since consumption and there were no apparent signs of intoxication; nor was Defendant in ill health or deprived of sleep.

When asked by the Court if she felt coerced in any way, Defendant replied no; in fact she gave her statement to officers while weeping[,] suggesting remorse but clearly without any signs of threats or coercion appearing from the testimony on the record.

(Tr. July 7, 1997, at 16-19.)

## 4. Analysis

Reasonable jurists could disagree on whether Petitioner was in custody.  On the one hand, Petitioner permitted a uniformed police officer to enter her apartment building.  She admitted Lieutenant Kucorn and Sergeant Sanborn in her apartment after being informed by the

12

uniformed officer that the two detectives wanted to speak with her.  The detectives claimed that they did not have probable cause to arrest Petitioner and that they were merely pursuing a tip from an informant.  Lieutenant Kucyk allegedly informed Petitioner that she was not under arrest, and both detectives claimed that Petitioner was free to move about the apartment. Petitioner's relationship with the detectives was not coercive or hostile by any means.  The detectives indicated at the evidentiary hearing that Petitioner was very cooperative, and Petitioner herself declared on her written statement that the detectives had been kind and understanding and had not forced her to make a statement.  Kucyk and Sanborn were wearing casual clothing, and no weapons were visible.  Petitioner was not frisked in her apartment, nor handcuffed when she left the apartment with an officer, and she was not locked in the officer's car on the way to the Sheriff's Department.

Other facts weigh in favor of the view that Petitioner was in custody.  For example, Petitioner testified that, when she heard the buzzer to her apartment, she looked out the window and saw two police cars parked in front of her car.  She stated that she saw three uniformed officers when she opened her apartment door and that the two plain clothes detectives came from behind a wall.  She thought she was under arrest as soon as she saw Lieutenant Kucyk whom she recognized from televised news reports.  She heard Kucyk instruct two officers to stay in the hallway.  One of the officers in the hallway testified that he probably would have stopped Petitioner if she had tried to run out of the apartment.  There were at least two marked police cars outside Petitioner's apartment building and three unmarked police cars.

Petitioner probably was not in custody when the officers first entered her apartment.  The plan was to interview Petitioner, not to arrest her.  Lieutenant Kucyk testified at the evidentiary

hearing that Petitioner could have done anything she liked before she made her statement. Kucyk further testified that the officers knew before they entered the apartment that they would have to leave if Petitioner asked them to leave or said that she did not want to talk with them anymore.      The Court believes that Petitioner was in custody shortly after the officers indicated that they were investigating the Iverson murder.  At that point, Petitioner allegedly started crying, became visibly upset, and responded. "I did not mean to hurt her."  This was a tacit admission that she was involved in the crime and played a part in harming Dr. Iverson. Although Petitioner claimed at the evidentiary hearing that she did not remember making that statement, she did acknowledge having informed the officers of her involvement in the crime. Lieutenant Kucyk testified that, although he did not know whether Petitioner would be a witness or a defendant after she gave her first statement, he would not have permitted her to leave. Sergeant Sanborn was more evasive, claiming that the custody issue was hypothetical, because it never came up at the apartment.

        A reasonable person in Petitioner's shoes would not have felt free to leave.  Although the questioning occurred at home and the atmosphere were not hostile or coercive, the police arrived close to midnight.  It is not disputed that, at least three male officers walked up to Petitioner's second-floor apartment.  There were other officers in the apartment building.  The record indicates that Petitioner was informed almost immediately that the officers were investigating a murder.  Petitioner then made the admission that she did not mean to hurt the victim.  She proceeded to explain everything that had occurred, including her own role in the murder.  This statement took about half an hour to complete.  Although Petitioner allegedly was told that she was not under arrest, she apparently was not informed that she could leave the premises or that

14

she could ask the officers to depart.  Even assuming that she was free to move about her apartment, a reasonable person would not have felt free to exit the apartment without the officers' permission.

The objective circumstances of the interrogation lead the Court to conclude that Petitioner was in custody and should have been advised of her constitutional rights before she made her first oral statement.  The Court, however, may not grant habeas relief simply because it concludes in its independent judgment that the state court applied the law incorrectly. *Yarborough*, 124 S. Ct. at 2150.  "Relief is available under § 2254(d)(1) only if the state court's decision is objectively unreasonable."  *Id.*  The question of custody was a close one, and the state courts' conclusions were not entirely unreasonable.  Even if the state court decisions were deemed unreasonable, the Court has concluded for the following reasons that the constitutional error in admitting Petitioner's first statement was harmless.

### 5.  Harmless Error Analysis

Harmless-error analysis applies to coerced confessions.  *Arizona v. Fulminante*, 499 U.S. 279, 295 (1991).  "When reviewing state court decisions for harmless error in a collateral appeal this [C]ourt applies the harmless error standard set out in *Brecht v. Abrahamson*, which holds that a habeas petitioner must establish the trial error had a 'substantial and injurious effect or influence in determining the jury's verdict.'  507 U.S. 619, 637 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946))."  *Jordan v. Hurley*, 397 F.3d 360, 363-64 (6th Cir. 2005).

Anita Krawczyk, who was a close friend of Petitioner, testified that Petitioner informed her more than once that she and McConnell Adams committed the crimes.  According to

15

Krawcyzk, Petitioner provided considerable detail about the incident, including the fact that she handed her belt to Adams and knew the victim was going to die after Adams mentioned Petitioner's name in front of the victim. Although at first Krawcyzk did not believe Petitioner, she no longer held that opinion at trial.

Mark Dawson also testified that Petitioner informed him of her and McConnell Adams involvement in the murder. Petitioner admitted to Dawson that she drove the victim's truck and handed her belt to Adams, who used it to strangle the victim. According to Dawson, Petitioner knew when she handed her belt to Adams that Adams intended to kill the victim.

Leda Stewart testified that she met Petitioner in jail. Petitioner allegedly informed Stewart that she (Petitioner) had decided to kill the victim and that she had no remorse. Petitioner also allegedly informed Stewart that she had taken the belt from her coat and tried to choke the victim. Because she was not strong enough, her boyfriend took over and succeeded in strangling the victim.

Petitioner's fingerprints were found on two of the victim's checks, which Petitioner and McConnell Adams cashed. Petitioner herself described the incident in detail at trial and admitted her involvement in the crimes. Her testimony differed significantly from that of Mark Dawson, Anita Krawcyzk, and Leda Stewart in that she claimed she was following Adams' orders and did not know Adams intended to hurt the victim. She admitted, however, on cross-examination that she had not told anyone she was afraid of Adams that day. She further admitted that Adams was abusive only when he was drunk and he was not drunk on the day of the murder. She also knew that Adams was carrying a BB gun, which he intended to use to rob someone.

16

Finally, as the following section demonstrates, Petitioner's subsequent statement at the Sheriff's Department was admissible. The statement at the Sheriff's Department was equally as incriminating as the statements made at Petitioner's apartment.

Given the strength of the other evidence against Petitioner, any constitutional error in admitting Petitioner's first statement in evidence was harmless. While the first statement might have had a powerful bolstering effect, another valid confession was admitted in evidence, and the admissible evidence was overwhelming and one-sided. Therefore, the first statement could not have had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 623 (quoting *Kotteakos*, 328 U.S. at 776).

## B. The Post-Miranda Confession

Habeas claim III attacks Petitioner's statement at the Detective Bureau of the Oakland County Sheriff's Department. Because Petitioner was "in custody" by then, the detectives advised her of her constitutional rights before eliciting that statement. Petitioner waived her constitutional rights and confessed a third time to her involvement in the abduction and murder of Dr. Iverson. Petitioner alleges, however, that the statement was inadmissible because it was tainted by her earlier statements.

### 1. The State Court Decisions

The trial court determined that Petitioner was transported to the Sheriff's Department at approximately 3:30 a.m. on December 31, 1996, that she was informed of her constitutional rights, and that she waived those rights. The trial court concluded that any subsequent inculpatory statement was admissible because Petitioner had been properly advised of her constitutional rights and waived them.

The Michigan Court of Appeals agreed that Petitioner was fully advised of her constitutional rights and waived those rights.  The court of appeals found no indication that the statement at the police station was obtained illegally or involuntarily.  The court concluded that the statement was admissible because it was sufficiently disconnected from the prior written statement.

### 2.  Relevant Supreme Court Decisions

Petitioner maintains that the statement she gave at the sheriff's department was tainted by her earlier confessions, which were invalid because they were not preceded by *Miranda* warnings.  The Supreme Court rejected a similar argument in *Oregon v. Elstad*, 470 U.S. 298, 309 (1985), where it stated:

> It is an unwarranted extension of *Miranda* to hold that a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will, so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period.  Though *Miranda* requires that the unwarmed admission must be suppressed, the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made.

The Supreme Court held that, "a suspect who has once responded to unwarned yet uncoercive questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite *Miranda* warnings."  *Id*. at 318.

Last year, the Supreme Court considered a police protocol that called for giving *Miranda* warnings *after* an interrogation produced a statement and then asking questions intended to make the suspect repeat his or her admissions.  The Supreme Court held that "a statement repeated after a warning in such circumstances is inadmissible."  *Missouri v. Seibert*, 542 U.S. 600, 604

18

(2004). "[R]elevant facts that bear on whether *Miranda* warnings delivered midstream could be effective enough to accomplish their object" are:

> the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and the second, the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first.

*Id.* at 615.

### 3. The Facts

Lieutenant William Kucyk and Sergeant Mark Sanborn arrived at Petitioner's apartment in Clawson, Michigan at approximately 11:45 p.m. on December 30, 1996. Five to ten minutes later, she provided an oral statement, which lasted about a half hour. Kucyk then left the apartment and Petitioner wrote out a statement. When Kucyk returned to the apartment, the detectives asked Petitioner if she would accompany them to the Sheriff's Department. Petitioner agreed to accompany them and made arrangements for a babysitter. Although Petitioner testified that she thought she was handcuffed when she left her apartment, both detectives testified that Petitioner was not placed in handcuffs. Witnesses testified that Petitioner walked hand in hand with Sergeant Sanborn to his car and later into the Sheriff's Department.

On the way to the Sheriff's Department, the officers stopped to get cigarettes and pop for Petitioner. When they arrived at the Sheriff's Department, Petitioner walked hand-in-hand with Sergeant Sanborn into the building and sat with him in the vestibule. They subsequently were escorted to an interview room where Lieutenant Kucyk joined them. Lieutenant Kucyk had last seen Petitioner about an hour earlier at her apartment. He informed Petitioner that the circumstances had changed, that she was now in custody, and that he was required to read her

19

constitutional rights to her.  He then read Petitioner her constitutional rights, and she waived her rights.  She was asked just a few questions at the Sheriff's Department.  Her statement there was similar to the statement that she gave at her apartment, except that she provided some details, which she had not mentioned earlier.  She stated that McConnell Adams had been carrying a BB gun, which was made to look like a revolver, and that he had shoved the gun into the small of the victim's back.  The other new detail was that Petitioner had worn a disguise (a red hat and sunglasses).

### 4. Analysis

This case is distinguishable from *Seibert* in that the statements at Petitioner's apartment and her subsequent statement at the Sheriff's Department cannot realistically be seen as parts of a single unwarned sequence of questioning.  Unlike the coordinated and continuing interrogation in *Seibert* where *Miranda* warnings were given midstream, Petitioner's statement at the Sheriff's Department was subject to independent evaluation.  The same two detectives who interviewed her at home also questioned her at the Sheriff's Department, and the statements were similar in detail and content.  However, there was a considerable change in surroundings and location and a break in time.  These factors, combined with Lieutenant Kucyk's explanation that Petitioner was now in custody, placed Petitioner in a position where she could make an informed choice about whether to waive her constitutional rights.  Therefore, Petitioner could not have been misled or deprived of knowledge essential to understanding the nature of her rights and the consequences of abandoning them.  A reasonable person could have viewed the questioning at the Sheriff's Department as a markedly different experience from the earlier, unwarned questioning at Petitioner's apartment.  Thus, the *Miranda* warning made sense and presented a

genuine choice about whether to repeat the earlier admissions.

The Court concludes that the detectives' initial failure to administer *Miranda* warnings did not taint Petitioner's subsequent admissions at the Sheriff's Department.  Because the record indicates that Petitioner's admissions at the Sheriff's Department were voluntary and uncoerced, the state appellate court's decision upholding the admission of the station house statement was not contrary to, or an unreasonable application of, Supreme Court precedent.

### C.  The Verdict Form and Jury Instructions

The fourth habeas claim alleges that the jury instructions were hopelessly confused and a violation of Petitioner's constitutional right to due process.  Petitioner asserts that the trial court altered the verdict form and erroneously instructed the jury on larceny.

The question on habeas review of jury instructions and verdict forms is whether the ailing instructions "so infected the entire trial that the resulting conviction violates due process."  *Cupp v. Naughten*, 414 U.S. 141, 147 (1973).  Errors in jury instructions do not rise to the level of a constitutional violation unless the habeas petitioner can make that showing.  *Buell v. Mitchell*, 274 F.3d 337, 365 (6th Cir. 2001).  The fact that the jury instructions and verdict form may have been incorrect under state law is not a basis for habeas relief.  *Estelle v. McGuire*, 502 U.S. 62, 71-72 (1991).  Moreover, the Supreme Court has defined the category of infractions that violate fundamental fairness very narrowly.  *Byrd v. Collins*, 209 F.3d 486, 527 (6th Cir. 2000) (quoting *Dowling v. United States*, 493 U.S. 342, 352 (1990)).

### 1.  The Verdict Form

Petitioner alleges that the trial court altered the verdict form after closing arguments to make aiding and abetting appear as a separate offense.  According to Petitioner, the trial court

blurred the distinctions between lesser-included offenses and co-equal offenses.

The verdict form provided an opportunity to find Petitioner "guilty of first-degree murder or guilty of aiding and abetting same." This language apparently appeared on one line with a box next to "aiding and abetting same." Petitioner objected to the form on the ground that it made aiding and abetting look like a crime in itself or a lesser-included offense. The trial court noted the objection, but adopted the prosecutor's position that the form was consistent with the instructions that the court was prepared to give and merely reflected state law. (Tr. Oct. 23, 1997, at 285-90; Tr. Oct. 24, 1997, at 3-9.)

The Michigan Court of Appeals found no error in the form, because the trial court properly instructed the jury on aiding and abetting and because the form "properly reflected the law that one convicted as an aider and abettor is punished the same as the principal of the offense. MCL 767.39; MSA 28.979." *Coomer*, 245 Mich. App. at 223; 627 N.W.2d at 622. The court of appeals concluded that there was no prejudice inuring to Petitioner as a result of the language on the verdict form.

This Court agrees. The verdict form did not misstate the law. At worst, it reminded the jurors that they could find Petitioner guilty as an aider and abettor even if they did not believe she was the person who actually strangled the victim. The form was consistent with the law on aiding and abetting and with the jury instructions on aiding and abetting. Because the form also listed accessory after the fact as a possible verdict (Tr. Oct. 24, 1997, at 33), the form was consistent with Petitioner's defense as well.

The form was not fundamentally unfair, and Petitioner has not cited any Supreme Court decision that prohibits the type of verdict form used in this case. Therefore, the state court's

conclusion that no prejudice inured to Petitioner did not result in a decision that was contrary to, or an unreasonable application of, Supreme Court precedent.

## 2.  The Underlying Felony

Petitioner alleges that the trial court erroneously instructed the jury on larceny as the underlying felony to felony murder when kidnapping was the underlying felony.  Petitioner raised this claim for the first time in the Michigan Supreme Court on state collateral review of her conviction.  The state supreme court denied leave to appeal without adjudicating the merits of Petitioner's claim.  Therefore, this Court must review the claim *de novo.  Howard*, 405 F.3d at 467.

Petitioner's argument has no basis in fact, because the indictment charged Petitioner with committing a homicide during the perpetration or attempted perpetration of a kidnapping *or* a larceny.  (Tr. Oct. 14, 1997, at 128-29.)  The prosecutor also stated in his opening argument that Petitioner was charged with a killing that occurred during the course of a kidnapping or larceny.  (Tr. Oct. 16, 1997, at 40.)  Furthermore, there was evidence that the two defendants stole the victim's purse during the course of the murder.  Thus, the trial court did not erroneously instruct the jury when it explained that either kidnapping or a larceny could serve as the underlying felony for the felony murder charge.  (Tr. Oct. 24, 1997, at 19-21.)  The instruction was not incorrect and it did not violate Petitioner's right to due process.

## D.  Trial and Appellate Counsel

Petitioner's fifth claim alleges that she was deprived of effective assistance of trial and appellate counsel.  Specifically, Petitioner alleges that her trial and appellate attorneys failed to attack the confusing jury instructions and failed to challenge the fact that the police illegally

entered the common entrance to her apartment building.  None of the state courts addressed

Petitioner's ineffectiveness claim on the merits.  The Court therefore reviews the claim *de novo*.

*Howard*, 405 F.3d at 467.

To prevail on a claim of ineffective assistance of counsel, a habeas petitioner must show

that defense counsel's performance was deficient and that the deficient performance prejudiced

the defense.  *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  The proper standard for

attorney performance is "reasonably effective assistance."  *Id*.  The petitioner must demonstrate

that her attorney's "representation fell below an objective standard of reasonableness."  *Id.* at

688.  The prejudice prong of the *Strickland* test requires demonstrating "a reasonable probability

that, but for counsel's unprofessional errors, the result of the proceeding would have been

different.  A reasonable probability is a probability sufficient to undermine confidence in the

outcome."  *Id.* at 694.

The Court concluded above that the jury instruction on larceny as the underlying felony

for felony murder was not erroneous.  Because the jury instruction was not erroneous,

Petitioner's attorneys were not ineffective for failing to challenge the instructions.

Nor is there any merit to the claim that Petitioner's trial and appellate attorneys should

have objected to the fact that police officers entered her apartment building without a warrant or

exigent circumstances.  To prevail on her claim, Petitioner must prove that her "Fourth

Amendment claim is meritorious and that there is a reasonable probability that the verdict would

have been different absent the excludable evidence. . . ."  *Kimmelman v. Morrison*, 477 U.S. 365,

375 (1986)).

The police must obtain a warrant to enter an individual's home unless exigent

circumstances exist or the individual consents to the entry.  *Groh v. Ramirez*, 540 U.S. 551, 564

(2004); *Payton v. New York*, 445 U.S. 573, 590 (1980).  Officer Robert Hannah testified at the

evidentiary hearing that he rang Petitioner's doorbell and identified himself over the intercom on

December 30, 1996.  Petitioner then "buzzed" Officer Hannah and other police officers into the

apartment building.  Upon reaching Petitioner's second-floor apartment, Officer Hannah

explained that Detectives William Kucyk and Mark Sanborn wanted to speak with her.

Petitioner agreed to talk to the detectives and invited them into her apartment.  Because

Petitioner consented to the officers' entry, their presence in the building was legal, and

Petitioner's attorneys were not ineffective for failing to raise the Fourth Amendment issue.  An

attorney cannot be ineffective for failing to raise an issue that lacks merit.  *Greer v. Mitchell*, 264

F.3d 663, 676 (6th Cir. 2001).

### E.  The Cumulative Effect of Errors

Petitioner's sixth and final claim alleges that the cumulative effect of the foregoing errors

deprived her of a fair trial.  Petitioner urges the Court to review the record as a whole and grant

the writ.

The Sixth Circuit noted in *Lorraine v. Coyle*, 291 F.3d 416, 447 (6th Cir. 2002), *cert*

*denied*, 538 U.S. 947 (2003), that "the Supreme Court has not held that distinct constitutional

claims can be cumulated to grant habeas relief."  Therefore, it cannot be said that the state

court's judgment was contrary to any Supreme Court decision so as to warrant habeas relief

under 28 U.S.C. § 2254(d).  *Id.*  In other words, constitutional errors that would not individually

support habeas relief cannot be cumulated to support habeas relief.  *Moore v. Parker*, 425 F.3d

250, 256 (6th Cir. 2005).  Furthermore, any possible harm from Petitioner's claims, even when

25

combined, is insufficient to undermine the Court's confidence in the outcome of the verdict.  *Cf.*

*Tinsley v. Million*, 399  F.3d 796, 816 (6th Cir.), *cert. denied*, __ U.S. __, 126 S. Ct. 760 (2005).

### V.  Conclusion

For all the reasons given above, Petitioner is not entitled to the writ of habeas corpus.

Accordingly, her application for the writ [Doc. #1, June 15, 2004) is DENIED.


s/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge

Dated:  January 5, 2006

I hereby certify that a copy of the foregoing document was served upon counsel of record on
January 5, 2006, by electronic and/or ordinary mail.

s/Carol A. Hemeyer
Case Manager


### APPENDIX

### Statement of Facts

The Michigan Court of Appeals thoroughly summarized the facts leading up to

26

Petitioner's and McConnell Davis's convictions.  Because the state court's summary is

supported by the record, the Court quotes the summary in full:

> [The defendants'] convictions arise from the highly publicized kidnapping and
> murder of Dr. Deborah Iverson, an ophthalmologist, shortly after she left her
> psychiatrist's office in the city of Birmingham on May 16, 1996.  Dr. Iverson's
> vehicle was found the next day, parked in a rural area of Macomb County.  Dr.
> Iverson's body was found inside the vehicle, and an autopsy revealed that she had
> been strangled to death.  Further investigation revealed that two of Dr. Iverson's
> checks, totaling $1,300, had been cashed at the drive-through lanes of two banks
> on the morning of her disappearance.  It was not until December 30, 1996, when
> police officers received a telephone call from an attorney representing an
> anonymous source, that the police discovered that defendant and codefendant
> Adams were the perpetrators of the crime.
>
> The evidence at trial established the following circumstances of this case.
> Defendant and codefendant Adams, who were never married, lived together with
> their two-year-old son in an apartment in the city of Clawson.  On May 16, 1996,
> their rent was overdue, the apartment management had sent a seven-day notice
> demanding payment or to vacate the premises, and they owed $480 to their day-
> care provider.
>
> Dr. Robert Iverson, who was married to Dr. Deborah Iverson, left their home at
> 7:00 a.m. on May 16, 1996, at about the time that their younger son's babysitter,
> Evelyn Watson, arrived at the house.  Deborah Iverson drove her older son to
> school at 7:45 a.m., informing Watson that she would be returning home at about
> 10:00 a.m. Deborah Iverson had an appointment at 9:00 a.m. with a psychiatrist,
> whose office was located in downtown Birmingham.  She left the office at 9:45
> a.m.  In the meantime, defendant and codefendant Adams dropped off their son
> with their day-care provider in Madison Heights at about 9:30 a.m.  The day-care
> provider's home is about a fifteen-minute drive from downtown Birmingham.
> Deborah Iverson did not return home at 10:00 a.m, and when her son's class let
> out at 12:30 p.m., the school called the Iverson home and told Watson that
> Deborah Iverson had not picked up the child.  Watson attempted to call Deborah
> Iverson on her cellular telephone, but did not receive an answer.  Watson then
> picked up the child herself and called Robert Iverson.  He arrived home at about
> 1:30 p.m. and also tried to call Deborah Iverson on her cellular telephone, but did
> not receive an answer.  He also called her office and was told that she had not
> shown up there.  He discovered that she had left the psychiatrist's office after her
> scheduled appointment. Robert Iverson then telephoned the police to report that
> his wife was missing.
>
> At about 5:00 p.m. on May 16, 1996, Ernest Sampson noticed a green Toyota

27

Land Cruiser on the side of Snell Road while driving in Washington Township. Sampson again noticed the same vehicle the following morning and recognized that the license plate on the vehicle corresponded to that of a vehicle belonging to a woman reported as missing on the radio. Sampson stopped and looked inside the vehicle and saw a body lying facedown on the floor in the back seat. Sampson called the police, who arrived shortly thereafter. The police found blood on the right side of Deborah Iverson's face and a line or mark on her neck. Her black and white jacket was missing a large square piece. Some spots on her jacket were faded and there were a couple of faded spots on the back seat of the vehicle. She was clutching a picture of one of her sons in her hand. The police also noticed footprints around the vehicle.

The medical examiner performed an autopsy on May 17, 1996, and testified that Deborah Iverson had been dead for at least twenty-four hours at that time. The cause of death was ligature strangulation, which involved the use of some sort of noose around her neck, such as a belt. The medical examiner also testified that the ligature pattern indicated that there may have been a struggle, that the strangulation was not quick, and that it may have been agonizing.

The police investigation later discovered that some checks drawn on the Iversons' account at Michigan National Bank had been cashed on the day of the killing. A bank teller at the drive-through lane of one of the branches testified that at about 10:00 a.m. on May 16, 1996, a white female customer with blond hair submitted a check for $1,000 made out to "cash." The teller did not see anyone else in the vehicle. The check, however, had not been signed on the back, and the teller sent the check back for a signature and for a driver's license. The check was returned to the teller with a signature on the back and with Deborah Iverson's license. During the trial, Robert Iverson testified that while the writing on the front of the check was that of his wife, the signature on the back of the check was not in her handwriting. The teller cashed the check and the time of the transaction was 10:08 a.m. A second bank teller at a different branch also testified that at about 11:00 a.m. on May 16, 1996, she cashed a check for $300 made out to "cash." During the trial, Robert Iverson again testified that the writing on the front of the check was in his wife's handwriting. He also stated that the endorsement on the back was in her handwriting, but was "jittery." The time of the second transaction was 11:04 a.m. Defendant's fingerprints were ultimately found on both checks.
On May 17, 1996, codefendant Adams paid their overdue child-care bill of $480 in cash. The day-care provider testified that Adams' left hand was bandaged when he paid the bill. On May 18, 1996, defendant and codefendant Adams paid $615 in overdue rent to the apartment building owner.

It was not until December 30, 1996, that the police discovered any new leads. On December 29, 1996, defendant telephoned her friend Mark Dawson stating that

codefendant Adams had beaten her. Defendant was at the house of another friend, Anita Krawczyk. Dawson went to Krawczyk's house that afternoon, and defendant told him of the Iverson murder. Defendant told Dawson that she and codefendant Adams had originally planned to rob Deborah Iverson, but after cashing two of her checks, codefendant Adams strangled her with defendant's coat belt. Defendant and codefendant Adams then sprayed Deborah Iverson's body and the inside of the vehicle with bleach and burned her purse. Defendant told Dawson that she had not reported codefendant Adams' assault because he was holding the murder over her. Dawson testified that Krawczyk later called the police to report the assault. When the police arrived, defendant told the police that codefendant Adams had beaten her and left in a stolen truck.

As defendant and Krawczyk were driving to the Clawson police station to report the domestic assault, defendant told Krawczyk that she was worried about being arrested for the Iverson murder and that she and codefendant Adams had agreed that if they were ever caught, he would take all the blame so that one of them could remain free to raise their son. Shortly thereafter, codefendant Adams was arrested for domestic assault.

On December 30, 1996, Dawson's attorney contacted the Oakland County Sheriff's Department with information that defendant was involved in the Iverson murder. Dawson later met with two officers from the sheriff's department and told them what defendant had told him. Police officers then went to defendant's apartment later that night. At the apartment, defendant confessed her involvement in the Iverson murder, stating that what began as a robbery culminated in Iverson's murder. After giving this oral statement, defendant prepared a written statement for the police. She then went with police officers to the Oakland County Sheriff's Department and gave another oral statement confessing her involvement in the Iverson murder. On December 31, 1996, police officers executed a search warrant at defendant's apartment and found her black leather coat with belt loops, but no belt, and a spray bottle of bleach with the Arbor name brand under the sink.

Krawczyk testified during the trial that she has known defendant and codefendant Adams for many years. Krawczyk testified that a few days after the killing, she was at defendant's apartment watching television and saw several news reports about Iverson's murder. Each time a news report came on, defendant would turn up the volume, and when the story was over, defendant would turn the news off. Krawczyk asked defendant why she was so interested in the news reports, and defendant responded that she and codefendant Adams had "done that." Krawczyk did not take defendant seriously. However, in October or November 1996, while watching news reports of the Iverson case, defendant again told Krawczyk, in the presence of defendant's mother, that she and codefendant Adams "were the ones that [the police] were looking for."

Krawczyk also testified that another time in 1996, she and defendant were talking about the Iverson case. Defendant stated that she and codefendant Adams had planned to snatch a purse that day, and that they drove to a parking lot in Birmingham where codefendant Adams "opened his passenger door, just enough so the lady could not get into the car" and then pushed the lady into her vehicle. After driving around and cashing a couple of Iverson's checks, they stopped for cigarettes and defendant's name was mentioned in front of Deborah Iverson. Defendant stated that she then understood that Deborah Iverson was going to die. After defendant and codefendant Adams went to an Arbor Drugs store to buy bleach to clean off fingerprints, defendant gave codefendant Adams her coat belt. Defendant then went into the drug store, and when she returned to the vehicle, codefendant Adams told her to drive, turn the music up loud, and not look back.

At the trial, there was also evidence presented that at 11:09 a.m. on May 16, 1996, Birmingham parking lot enforcement officer Anita Gomez issued a parking ticket in municipal parking lot number seven to a vehicle that was registered to defendant. Defendant testified during the trial on her own behalf. She testified that while she and codefendant Adams planned to rob a woman, she did not expect anyone to get hurt and that codefendant Adams made all the decisions. She testified that codefendant Adams noticed the Land Cruiser and told her to park next to it. Codefendant Adams checked the parking meter where the Land Cruiser was parked, looked inside the vehicle, and told defendant that he knew a woman was driving the Land Cruiser because of certain items he saw in it. They sat in their car and codefendant Adams noticed a woman walking toward the Land Cruiser. He placed a BB gun to Deborah Iverson's back and forced her into the Land Cruiser. According to defendant, when codefendant Adams asked for her belt, he said that he was just going to tie up Deborah Iverson. After giving him the belt, defendant went into the Arbor Drugs store. When she returned to the vehicle, she did not look in the back seat. When she stopped at a stop sign, defendant looked in the rearview mirror and saw that codefendant Adams was no longer kneeling over Deborah Iverson on the floor, but was sitting in the back seat. Defendant claimed that she began to cry when codefendant Adams said, "Anitra, it's done. It's over."

According to defendant, codefendant Adams then told her to drive home, which she did. He went to their apartment and eventually got his pickup truck. In the meantime, defendant waited for him behind a store. They met and drove out to Macomb County and left Deborah Iverson in her vehicle on Snell Road.

*Coomer*, 245 Mich. App. at 208-15; 627 N.W.2d at 615-18.